UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SIGN BRITE, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No.4:15-cv-1216 |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| RAWLINGS SPORTING | ) |
| GOODS COMPANY, INC. | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Sign Brite, Inc. ("Sign Brite"), for its Complaint against Defendant Rawlings Sporting Goods Company, Inc. ("Rawlings"), states as follows:

### Parties

1.  Plaintiff Sign Brite, Inc. is a corporation organized under the laws of the State of New York and has a principal place of business at 31 Birch Way, Tarrytown, New York 10591.

2.  Upon information and belief, Defendant Rawlings Sporting Goods Company, Inc. is a corporation organized under the laws of the State of Delaware and has a principal place of business at 2381 Executive Center Drive, Boca Raton, Florida 33431.  Defendant Rawlings Sporting Goods Company, Inc. also has a place of business at 510 Maryville University Drive, St. Louis, Missouri 63141.

### Jurisdiction and Venue

3.  This is an action for breach of contract and breach of the implied covenant of good faith and fair dealing under Missouri law.

4.  The Court has subject matter jurisdiction over these claims based on diversity jurisdiction under 28 U.S.C. § 1332.  Sign Brite and Rawlings are diverse as they each reside in a

different state. In addition, the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5. The Court has personal jurisdiction over Rawlings. Rawlings has a place of business, has transacted business, and continues to transact business in this judicial district. Moreover, this lawsuit derives out of business transacted by Rawlings in this judicial district.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), (c), and (d), as a substantial part of the events or omissions giving rise to the claim occurred here, Rawlings resides here, and Rawlings is subject to personal jurisdiction here.

## Facts

7. Sign Brite was founded by James McVeigh and James Quinn. Mr. McVeigh, Mr. Quinn, and others at Sign Brite developed a product for providing a light source in the leg guards for a baseball catcher that would automatically illuminate when the catcher squatted to give the pitching signs to the pitcher. This innovative product also included circuitry and software that would sense when the light needed to be turned on and off so as not to create a distraction during play and also not to waste the batteries ("the Sign Brite Technology").

8. The Sign Brite Technology makes it much easier for the pitcher to read the catcher's sign, even on dark or shadowed playing fields.

9. As a result of this increased visibility, the Sign Brite Technology reduces the risk of having the signs crossed up between the pitcher and catcher and thus reduces the risk of injury to the catcher and umpire. Serious injuries resulting from crossed up signs are well known in the history of baseball at all levels.

10. In 2009, Sign Brite designed and built a working prototype that integrated the Sign Brite Technology into a pair of catcher's leg guards (hereinafter the "Integrated Products").

2

11. Sign Brite also designed a separate accessory that could be attached to an existing pair of leg guards to make the Sign Brite Technology universally available (hereinafter the "Accessory Products").

12. On September 24, 2009, Mr. McVeigh, Mr. Quinn, and the other Sign Brite inventors filed U.S. Patent Application No. 12/566,262 ("the '262 application") with the United States Patent and Trademark Office ("USPTO") directed to the Sign Brite Technology.

13. The '262 application was duly and legally issued as United States Patent No. 8,161,570 ("the '570 patent"), entitled "Catching Gear With Apparatus for Increasing Hand Signal Visibility," by the USPTO on April 24, 2012. A copy of the '570 patent is attached as Exhibit 1.

14. Sign Brite is the owner by assignment of the '570 patent.

15. On September 30, 2009, Mr. McVeigh, Mr. Quinn, and Michael Matheny (a former Major League Baseball catcher and the current manager of the Saint Louis Cardinals) met with a Rawlings representative, Mr. Travis Gessley, to discuss the Sign Brite Technology. During that meeting, Mr. Matheny strapped on the Integrated Product prototype and demonstrated it for Mr. Gessley.

16. At the September 30, 2009 meeting, Mr. Gessley expressed a desire to develop the Sign Brite Technology.

17. On information and belief, in the months following the September 30, 2009 meeting, Mr. Gessley demonstrated the Integrated Product prototype to the salesforce and other employees at Rawlings.

18. Mr. Gessley reported to Sign Brite that the Integrated Product prototype received very positive feedback from the Rawlings employees.

3

19. On October 29, 2009, Mr. Gessley informed Sign Brite that Rawlings "definitely" wanted to promote the Sign Brite Technology for softball in addition to baseball.

20. On information and belief, field testing with the Integrated Product prototype was subsequently performed by Rawlings.

21. On January 19, 2010, Mr. Gessley sent an email to Messrs. McVeigh and Quinn stating that a cross section of players and parents gave the prototype very favorable reviews. Specifically, Mr. Gessley stated "[w]hen I demonstrated the Sign Brite Technology all I received was a positive response (WOW, Cool, tight, awesome, etc.)"

22. Mr. Gessley's January 19, 2010 email further stated that "[t]hey believe that the up-charge price for this in addition to the current price of leg guards would be about $20 retail. So if the normal leg guards were $80 retail they would pay $100 with the Sign Brite included."

23. After receiving this positive feedback, Mr. Gessley communicated to Sign Brite that Rawlings would also develop the Accessory Products that could be added to an existing pair of leg guards.

24. Sign Brite offered design assistance to Rawlings for the Accessory Products and, at Sign Brite's sole expense, provided full CAD drawings for the design of the Accessory Products to Rawlings.

25. On information and belief, Rawlings thereafter contacted its suppliers to determine whether the suppliers could manufacture the Integrated Products per the prototype as well as the Accessory Products. On information and belief, all of the suppliers signed an NDA as part of their review.

26. On information and belief, by February 22, 2010, all of the suppliers contacted by Rawlings had reported back that they would be able to manufacture the Integrated Products as well as the Accessory Products.

27. On April 21, 2010, Mr. Gessley communicated to Sign Brite that, among other things, he was "100% interested in the Sign Brite technology for Rawlings," focus groups set up by Rawlings had been "very positive and there is definitely an interest," and identified that a "magic retail price for the [Sign Brite] technology would be $19.99 . . .."

28. On August 18, 2010, Mr. Gessley informed Sign Brite that "[w]e have been going down several paths trying to figure out the best designs to have Sign Brite as universal as possible to get the most sales as possible" and that "[t]he largest opportunity for sales would be the accessory that could be an after-market purchase that would be compatible to all these brands," including Rawlings, Easton, All-Star, Mizuno, and Wilson.

29. On information and belief, Rawlings then instructed its suppliers to work on the design for the Accessory Products.

30. Sign Brite offered to help with the design work for the Accessory Products.

31. Steve Remy, a mechanical engineer with Sign Brite, and others at Sign Brite subsequently suggested changes to the Accessory Products design to Rawlings.

32. On November 2, 2010, Mr. Gessley accepted an offer from Sign Brite to have Mr. Remy formally assist the Rawlings engineers with the Accessory Product design work.

33. Mr. Gessley also requested that Sign Brite send Rawlings all of the Sign Brite CAD files that had previously been created by Sign Brite's mechanical, software, and electrical engineers.

34. Sign Brite sent all such CAD files to Rawlings on November 2, 2010.

5

35. On November 19, 2010, Mr. Gessley informed Sign Brite that he "would like to launch at least the fully integrated one in the new catalog that will be out this coming May, if possible."

36. On information and belief, on or about December 3, 2010, Mr. Gessley traveled to China to check on the design and the progress of the engineering work being performed there.

37. On January 5, 2011, Rawlings provided a schedule to Sign Brite that projected production of a commercial Accessory Product would begin by July 2011.  A copy of the schedule is attached hereto as Exhibit 2.

38. Rawlings and Sign Brite then entered into an exclusive License Agreement, which was drafted by counsel for Rawlings, effective January 29, 2011.  A true and accurate copy of the License Agreement is attached as Exhibit 3.

39. The License Agreement provided for the licensed production and sale of the Integrated Products and Accessory Products by Rawlings.

40. In Article 5 of the License Agreement, Rawlings represented that:

**Licensee [Rawlings] agrees to proceed as quickly as** reasonably possible to market and sell both Licensed Accessory Products and Licensed Integrated Products.

41. No later than April 2011, at Rawlings' request, Sign Brite prepared user directions and provided feedback on the design of the Rawlings Spring 2011 Catalog.

42. Mr. Gessley thereafter invited Mr. McVeigh and Mr. Quinn to present the Sign Brite Technology to the Rawlings' sales force during May 2-4, 2011.

43. Mr. McVeigh and Mr. Quinn presented and demonstrated the Sign Brite Technology to the Rawlings' sales force during May 2-4, 2011.

6

44. All of the comments from Rawlings' sales force during the May 2-4, 2011 presentation were positive and the Rawlings' sales team expressed excitement to receive samples to show their clients.

45. On information and belief, on or about June 7, 2011, Mr. Gessley left his employment with Rawlings.

46. Sign Brite was subsequently advised that Scott Sorensen would thereafter be the point of contact.

47. In a reversal of prior strategy, Mr. Sorensen stated on July 27, 2011, that the Accessory Product would not be put on the market until after the Integrated Product had been introduced.

48. Sign Brite expressed disappointment with Rawlings' new plan and underscored their expectation that the launch of the Accessory Product should not be delayed or forgotten.

49. Mr. Sorensen informed Sign Brite that he concurred that the Accessory Product should not be delayed or forgotten.

50. On information and belief, Mr. Sorensen traveled to China on August 9, 2011, to check on the progress of the prototypes.

51. Mr. Sorensen subsequently reported to Sign Brite that things were going well.

52. On September 29, 2011, Sign Brite provided feedback for a prototype of the Integrated Product that was then under review by Rawlings.  This feedback covered the functioning of the software and the positioning and size of the on/off button.

53. Rawlings did not communicate approval of these button details to Sign Brite until on or about October 20, 2011.

54. On September 30, 2011, Rawlings, via its internet blog, issued a press release titled "New Pieces, New Technology Added to Rawlings' Catcher's Gear."

55. Regarding the Sign Brite Technology, Rawlings' September 30, 2011 press release stated:

> Available this fall, Rawlings' new Sign Brite™ technology provides light for the pitcher to see the catcher's signs. Sign Brite™ is a powerful LED light embedded in the upper pad of the catcher's left leg guard that turns on automatically when the catcher moves into the sign-giving position. It is available for adults under model number XLGSB and intermediate players under model number XLGSBI.

A true and accurate copy of the press release is attached hereto as Exhibit 4, and was also available at http://rawlingsgear.blogspot.com/2011/09/new-pieces-newtechnology-added-to.html.

56. The Integrated Product was also included in the Rawlings 2012 Catalog:



A true and accurate copy of the page of the 2012 Rawlings Catalog depicting the Sign Brite Technology is attached hereto as Exhibit 5.  Mr. Sorensen felt so strongly about the effectiveness and viability of the Sign Brite Technology that he personally posed as the model above demonstrating the product in the 2012 Rawlings Catalog.

9

57. The September 30, 2011 press release and the placement of the Integrated Product, with the inclusion of the Sign Brite brand, in the 2012 Rawlings Catalog created an expectation in the marketplace that the Sign Brite Technology was then available for purchase.

58. Despite Rawlings specific steps to promote and advertise the Integrated Products, including the September 30, 2011 Press Release and the 2012 Rawlings Catalog, Rawlings never manufactured, launched, or made the Integrated Products available in any way to any retailers or consumers.

59. On November 23, 2011, Sign Brite asked Mr. Sorensen when the Integrated Products would reach the market.

60. Mr. Sorensen responded by stating that there was "[n]o issue with the tooling" and that the Integrated Products "should launch sooner rather than later."

61. On December 30, 2011, Mr. Sorensen further advised Sign Brite that "[f]unding was approved for the tooling.  I will be there (China) for the next two weeks to investigate some attachment ideas. If you guys have any input, let me know."

62. Sign Brite responded to the December 30, 2011 communication with several ideas on how to attach the product.

63. On January 13, 2012, Sign Brite contacted Mr. Sorensen seeking an update, but Mr. Sorensen did not respond.

64. On March 15, 2012, Mr. Sorensen provided the following update via email:

> The next step is to create production samples using T1 tooling (should be next week). These would be to ensure waterproofing, tolerances, etc. regarding the plastic housing. The tool would then be polished and any finishing touches would be applied to T2. This generally takes 2 weeks. After T2 is completed, we would run another round of samples, which is essentially the pilot production, which is another 2 weeks. As long as everything goes well in the pilot run, production can

begin. I would say we could have production ready to go as early as the end of April. To be realistic, it will probably be closer to the end of May, which is still plenty of time to have inventory this summer.

65. On March 24, 2012, Mr. Sorensen advised Sign Brite that Matt Klein, also employed by Rawlings, would be leading the Sign Brite initiative along with Mr. Sorensen.

66. On April 3, 2012, Mr. Sorensen gave Eric Lv final approval to move forward with production of the Integrated Products.

67. On April 6, 2012, Mr. Klein sent an email to Sign Brite providing the latest rendering for the Integrated Product packaging and associated user instructions. Mr. Klein's email also included a B16 tag for the instruction video and the '570 patent number.

68. On April 11, 2012, Sign Brite informed Mr. Sorensen that Sign Brite had no further suggestions for any changes to the Integrated Product design.

69. On April 18, 2012, and without any prior warning, Mr. Klein advised Sign Brite that "keeping in mind our internal deadlines, Sign Brite will not appear in the 2013 Spring Catalog."

70. Mr. Klein also stated on April 18, 2012, that the Integrated and Accessory Products would "relaunch separately in the fall."

71. Despite this setback, on May 4, 2012, Sign Brite delivered, at Rawlings' request, an Instructional Video for the Integrated and Accessory Products to Mr. Sorensen, who said that the Instructional Video "looked great" and that the Rawlings marketing team liked it as well.

72. Mr. Sorensen also stated in that communication that Rawlings would not send the Instructional Video to the Rawlings sales team until everything was finalized for production of the Integrated and/or Accessory Products.

73. The Instructional Video was shot at Fordham University.  The head coach of Fordham University's baseball team, Kevin Leighton, informed Sign Brite during the filming of the video that he had previously heard about the Sign Brite Technology from his Rawlings' sales representative.

74. Mr. Leighton and several pitchers from Fordham University's baseball team observed the Sign Brite Technology during the filming of the video, and stated that the Sign Brite Technology solved their problem and expressed interest in buying the product.

75. On May 18, 2012, Mr. Lv sent an email to Sign Brite advising that they were having problems with the type of plastic they had chosen for production of the Integrated and/or Accessory Products and sought Sign Brite's advice concerning the type of material that should be used.

76. Mr. Lv's May 18, 2012 email also stated that the then current material was too soft and deformed too easily which caused water leakage and assembly issues.

77. Sign Brite thereafter consulted with Mr. Lv concerning material selection.

78. On July 27, 2012, Mr. Sorensen advised that production ready Integrated Products had been tested for impact strength in China and performed "better than expected."

79. These production ready leg guards were almost identical to the prototype that Sign Brite had provided to Rawlings for its initial tests in 2009.

80. On August 9, 2012, Mr. Sorensen advised that the Integrated Product was "Passed Date for Design Freeze" and was ready for launch.

81. Mr. Klein thereafter declined a Sign Brite offer to travel to St. Louis to meet with the sales force at the annual meeting in the Fall.  Mr. Klein further advised that he would not be

formally meeting with the sales team and was planning to only send samples to some sales teams looking for feedback across multiple demographics.

82. On October 12, 2012, Mr. Klein informed Sign Brite that he had sent samples to some sales teams looking for feedback across multiple demographics.

83. Communication from Mr. Klein thereafter ceased, despite repeated unanswered telephone calls from Sign Brite.

84. On January 3, 2013, Sign Brite yet again inquired as to where Rawlings stood on its plans to finally actually launch the Integrated and Accessory Products.

85. In response to Sign Brite's inquiries, Tim Lord was introduced as the head of product development for the Sign Brite Technology and a conference call with Mr. Lord and Sign Brite was set up.

86. A conference call between Mr. Lord and Sign Brite occurred on January 17, 2013.

87. During the January 17, 2013 conference call, Mr. Lord explained that his primary job responsibility at Rawlings was to reduce the number of Rawlings' overall product stockkeeping units ("SKUs").

88. In particular, Mr. Lord explained that there was specific internal pressure at Rawlings to reduce the number of leg guard SKUs.

89. Mr. Lord also advised Sign Brite that Rawlings was no longer interested in launching the Integrated Products, but might be interested in pursuing the Accessory Products if such could be designed as a piece that could fit any brand of leg guard.

90. On January 28, 2013, Sign Brite provided designs for a universal Accessory Product to Rawlings.

91. Rawlings responded to the Sign Brite's January 28, 2013 correspondence by informing Sign Brite that Rawlings was no longer interested in the Accessory Product.

92. Rawlings actions, including but not limited to promoting the fully Integrated Product to the marketplace in Rawlings' 2012 catalog and in Rawlings' September 30, 2012 press release and subsequently failing to actually make the Integrated and/or Accessory Products available for purchase, caused substantial confusion in the marketplace and greatly damaged Sign Brite's goodwill and reputation.

93. On April 2, 2015, Sign Brite and Rawlings participated in a mediation that was unsuccessful in resolving the issues between the Parties.

## Count I:  Breach of Contract

94. Sign Brite incorporates herein by reference Paragraphs 1 through 93 above as if fully set forth.

95. Rawlings breached the License Agreement, including but not limited to Article 5 of the License Agreement, by failing to proceed as quickly as reasonably possible to market and sell the Accessory Products and/or Integrated Products.

96. Sign Brite satisfied any and all conditions precedent to enforcement of the License Agreement.

97. As a direct and proximate result of Rawlings' breach of the License Agreement, Sign Brite has suffered damages in an amount to be determined at trial.  Such damages include without limitation lost royalties pursuant to the License Agreement, lost employee time and employee resources spent assisting Rawlings with the design of the Accessory and Integrated Products, and lost sales.

### Count II:  Breach of the Implied Covenant of Good Faith and Fair Dealing

98. Sign Brite incorporates herein by reference Paragraphs 1 through 97 above as if fully set forth.

99. Rawlings breached the implied covenant of good faith and fair dealing contained in the License Agreement referenced above.

100. Rawlings breached the implied covenant of good faith and fair dealing contained in the License Agreement by failing to bring to market Sign Brite's Accessory Products and/or Integrated Products quickly as reasonably possible.  Rawlings exercised its judgment conferred by the License Agreement in a manner that evaded the spirit of the License Agreement and denied Sign Brite the expected benefit of the License Agreement.

101. As a direct and proximate result of Rawlings' breach of the implied covenant of good faith and fair dealing contained in the License Agreement, Sign Brite has suffered damages in an amount to be determined at trial.  Such damages include without limitation lost royalties pursuant to the License Agreement, lost employee time and employee resources spent assisting Rawlings with the design of the Accessory and Integrated Products, and lost sales.

WHEREFORE, Sign Brite requests that the Court enter judgment against Rawlings and respectfully prays that the Court enters an order:

A. Finding that Rawlings breached the License Agreement;

B. Finding that Rawlings breached the implied covenant of good faith and fair dealing contained in the License Agreement;

C. Awarding actual damages to Sign Brite caused by Rawlings breaches of the License Agreement and implied covenants including, as appropriate, an award of attorneys' fees incurred in responding to the breaches;

D.      Awarding Sign Brite pre-judgment and post-judgment interest;

E.      Awarding Sign Brite its costs in this action; and

F.      Awarding such other and further relief as the Court deems just and proper.

Dated: August 10, 2015

Respectfully submitted,

SENNIGER POWERS LLP

By: /s/ Robert M. Evans, Jr.
   Robert M. Evans, Jr., #35613MO
   Michael J. Hartley, #55057MO
   Kyle G. Gottuso, #64869MO
   100 North Broadway, 17th Floor
   St. Louis, Missouri 63102
   Tel: (314) 345-7000
   Fax: (314) 345-7600
   Email: revans@senniger.com
          mhartley@senniger.com
          kgottuso@senniger.com

Attorneys for Plaintiff Sign Brite, Inc.